MCS: USAO2015R00147

FILED
U.S. DISTRICT COURT
DISTRICT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**UNITED STATES OF AMERICA**

    **v.**

**WALAYAT KHAN and**
**BARBARA ANN DUKE,**

        **Defendants**

**CRIMINAL NO.** *RDB-16-0423*

**(Conspiracy to Commit Food Stamp and Wire Fraud, 18 U.S.C. § 371; Food Stamp Fraud, 7 U.S.C. § 2024(b); Wire Fraud, 18 U.S.C. § 1343; Aiding and Abetting, 18 U.S.C. § 2; Forfeiture, 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c))**

\* \* \* \* \* \* \*

## INDICTMENT

### COUNT ONE
(Conspiracy to Commit Food Stamp Fraud and Wire Fraud)

The Grand Jury for the District of Maryland charges that:

### Introduction

At all times relevant to this Indictment:

1.    Defendant **WALAYAT KHAN** ("KHAN") was a resident of Maryland.

2.    Defendant **BARBARA ANN DUKE** ("DUKE") was a resident of Maryland.

### The Food Stamp Program/Supplemental Nutrition Assistance Program

3.    Congress passed the Food Stamp Act of 1977, which was later renamed the Supplemental Nutrition Assistance Program ("SNAP"), in an effort to alleviate hunger and malnutrition. The program used federal tax dollars to subsidize low-income households, which permitted those households to obtain a more nutritious diet by increasing the food purchasing power of eligible persons. SNAP was jointly administered by the United States Department of Agriculture ("USDA") and the Food and Nutrition Service ("FNS") together with various state

1

agencies.

4.      Title 7 of the Code of Federal Regulations, Section 278.2(a), prohibited an authorized retail food store from accepting food stamp coupons in exchange for cash. Further, Title 7 of the Code of Federal Regulations, Sections 278.2(a) and (h) provided that food stamp coupons may "only be accepted from eligible households or the households' authorized representative, and only in exchange for eligible food." Title 7 of the Code of Federal Regulations, Section 271.2 provided that food stamp coupons included "an electronic benefit transfer card or personal identification number issued pursuant to the provisions of the Food Stamp Act of 1977, as amended, for the purchase of eligible food."

5.      In Maryland, SNAP was administered by the Maryland Department of Human Resources ("DHR") and was known as the Food Supplement Program ("FSP"). Maryland implemented FSP, funded by SNAP, through an Electronic Benefits Transfer ("EBT") system. FSP customers were issued plastic EBT cards which contained an embedded magnetic stripe that stored basic information required for food purchases. Retailers approved by FNS to accept SNAP were assigned an FNS authorization number and, in some cases, were provided with a point of sale ("POS") device to access the electronic funds allocated to customer's EBT cards. POS devices communicated with the Maryland EBT central database to debit a customer's available SNAP benefit balance for the cash value of eligible food items purchased.

6.      Under the FSP, benefits were automatically added to a recipient's EBT card on a monthly basis. When an EBT card was swiped through a retailer's POS terminal, the swipe caused an electronic transmission of information through a series of network switches to the central Maryland EBT database located in Texas, which contained customer account balance information. The EBT contractor verified the retailer was authorized to conduct SNAP EBT

2

transactions. The Maryland EBT system verified the amount of benefits available, authorized the transaction, and deducted the purchase amount from the customer's available balance. The system also calculated cumulative FSP sales for each retailer and authorized electronic payments to the retailer's bank account.

7.      Once the EBT was approved, information flowed back to the POS terminal and the store employee received confirmation that the cardholder's account had been successfully debited. FSP EBT transactions were made for the exact amount of the sale and no change was given to the cardholder. SNAP reimbursements were paid to authorized retailers through a series of electronic funds transfers. On a daily basis, the EBT contractor, located in Austin, Texas, reconciled accounts for participating SNAP retailers in Maryland.

8.      In order to participate in the SNAP program as an authorized retailer, a business submitted FNS Form 252, Food Stamp Program Application for Stores to FNS. As part of that application, the store owner/manager certified that they understood and agreed that "trad[ing] cash for Supplemental Nutrition Assistance Program benefits" was a "violation" of SNAP regulations.

9.      In order to receive SNAP reimbursements, authorized retailers were required to establish a single authorized bank account, approved by FNS, into which EBT benefits from legitimate food stamp transactions would be deposited.

### KHAN and DUKE's Participation in the Food Stamp Program

10.     Maria's Market Place ("Maria's") was a convenience store located in Baltimore, Maryland. **DUKE** was the owner and resident agent of Maria's. **KHAN** worked at Maria's.

11.     On or about September 2, 2013, **DUKE** submitted an FNS Form 252 for Maria's to FNS. As part of that application, **DUKE** submitted a form certifying that she understood that

3

it was a violation of SNAP regulations to trade cash for SNAP benefits. Maria's was authorized as a SNAP retailer on or about September 30, 2013.

12.     Royals Food Market ("Royals") was a convenience store located in Brooklyn, Maryland. **KHAN** was the owner and resident agent of Royals.

13.     On or about September 1, 2015, **KHAN** submitted an FNS Form 252 for Royals to FNS. As part of that application, **KHAN** submitted a form certifying that he understood that it was a violation of SNAP regulations to trade cash for SNAP benefits. Royals was authorized as a SNAP retailer on or about September 15, 2015.

14.     From in or about October 2013 through at least in or about June 2016, **KHAN**, **DUKE**, and others have routinely redeemed and caused to be redeemed EBT benefits in exchange for cash in violation of the food stamp program rules and regulations. As a result of unlawful stamps-for-cash transactions at Maria's that occurred between October 2013 and March 2016, bank accounts for Maria's received more than $949,102 in EBT deposits for food sales that never occurred or were substantially inflated. Similarly, as a result of unlawful stamps-for-cash transactions at Royals that occurred between October 2015 and March 2016, a bank account for Royals received more than $537,016 in EBT deposits for food sales at Royals that never occurred or were substantially inflated. **KHAN** and **DUKE** knew that exchanging cash for EBT benefits was in violation of the laws, rules, and regulations regarding the food stamp program and that they were consequently not entitled to the EBT deposits made by FNS into bank accounts for Maria's and Royals.

### The Scheme to Defraud

15.     From in or about October 2013 through at least in or about June 2016, in the District of Maryland and elsewhere, the defendants,

**WALAYAT KHAN and**
**BARBARA ANN DUKE,**

knowingly and willfully devised and intended to devise a scheme and artifice to defraud, and to

obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises, and material omissions from SNAP, a federally funded national

malnutrition program jointly administered by USDA and FNS, together with various state

agencies ("the scheme to defraud").

### The Conspiracy to Defraud

16.     From in or about October 2013 through at least in or about June 2016, in the

District of Maryland and elsewhere, the defendants,

**WALAYAT KHAN and**
**BARBARA ANN DUKE,**

did knowingly and willfully conspire and agree with each other, and with others known and

unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.      to knowingly use, acquire, and possess food stamp coupons, through an

EBT card, having a value in excess of $100 in a manner contrary to the Food Stamp Act (Title 7,

United States Code Section 2011, et seq.) and the regulations issued pursuant to that program in

that the defendants, directly and indirectly, purchased food stamp benefits for cash, in violation

of Title 7, United States Code, Section 2024(b), and

b.      to knowingly, and with intent to defraud, devise and intend to devise a

scheme and artifice to defraud, and to obtain money and property by means of materially false

and fraudulent pretenses, representations and promises, knowing that the pretenses,

representations and promises were false and fraudulent when made, and for the purpose of

executing the scheme and artifice, to knowingly transmit and cause to be transmitted, by means

of wire communication in interstate commerce, certain writings, signals, pictures and sounds in violation of Title 18, United States Code, Section 1343.

## The Object of the Conspiracy and Scheme to Defraud

17.     It was the object of the conspiracy and scheme to defraud for **KHAN, DUKE**, and others to obtain money to which they were not entitled by acquiring food stamp benefits in exchange for lesser amounts of cash.  When conducting these unlawful transactions, store clerks at Maria's and Royals (including **KHAN**) would debit funds from an EBT card and pay the individual who had presented the EBT card in cash, at less than full value.  To avoid detection, funds would be debited from EBT cards in multiple transactions spread over a period of hours. By executing this scheme to defraud, bank accounts for Maria's received more than $949,102 in EBT deposits for food sales that never occurred or were substantially inflated, and a bank account for Royals received more than $537,016 in EBT deposits for food sales at Royals that never occurred or were substantially inflated.

## Manner and Means of the Conspiracy and Scheme to Defraud

18.     It was part of the conspiracy and scheme to defraud that **KHAN** and **DUKE** created Maryland corporations for the purpose of operating convenience stores that participated in the SNAP program in Maryland.

19.     It was further part of the conspiracy and scheme to defraud that **KHAN** and **DUKE** applied to participate in the SNAP program.

20.     It was further part of the conspiracy and scheme to defraud that Maria's and Royals, through **DUKE** and **KHAN**, respectively, were authorized to participate in the SNAP program.

21.     It was further part of the conspiracy and scheme to defraud that **KHAN** and **DUKE** opened bank accounts for the purpose of receiving SNAP benefits.  Both **KHAN** and **DUKE** engaged in transactions involving bank accounts in the name of each store (Maria's and Royals):  **DUKE** and **KHAN** both signed checks from at least one bank account in the name of Maria's, and **DUKE** and **KHAN** both signed checks from at least one bank account in the name of Royals.

22.     It was further part of the conspiracy and scheme to defraud that **KHAN, DUKE,** and others caused EBT point of sale devices in Maryland to electronically transmit interstate requests to authorize transactions and deduct amounts from EBT customers' available balances for unauthorized and unlawful purposes.

23.     It was further part of the conspiracy and scheme that **KHAN, DUKE,** and others caused the Maryland EBT System (through the EBT contractor) to electronically transmit an interstate signal that authorized electronic payment to the bank account of one of the convenience stores.  Once the transaction was approved, information flowed back to the POS terminal confirming that the cardholder's account had been successfully debited.

24.     It was further part of the conspiracy and scheme to defraud that (in order to avoid detection) **KHAN, DUKE,** and others debited and caused to be debited funds off EBT cards in multiple transactions spread over a period of hours to disguise the fraudulent nature of the transactions.

25.     It was further part of the conspiracy and scheme to defraud that **KHAN, DUKE,** and others falsely and fraudulently redeemed and caused to be redeemed from the United States government the full amount of the EBT food stamp benefits charged on the EBT cards and caused this money to be deposited into bank accounts in the names of Maria's and Royals.

## Overt Acts

26.     In furtherance of the conspiracy and scheme to defraud and to affect the objects thereof, at least one of the co-conspirators committed and caused to be committed, in the District of Maryland and elsewhere, at least one of the following overt acts:

a.     On or about February 12, 2015, a store clerk completed a SNAP transaction at Maria's for $62.20 in exchange for $30 in cash.

b.     On or about March 12, 2015, in the presence of **DUKE**, a store clerk completed a SNAP transaction at Maria's for $123.23 in exchange for $60 in cash.

c.     On or about April 14, 2015, in the presence of **DUKE**, a store clerk completed a SNAP transaction at Maria's for $120.83 in exchange for $60 in cash.

d.     On or about May 15, 2015, a store clerk completed a SNAP transaction at Maria's for $202.09 in exchange for $100 in cash.

e.     On or about September 11, 2015, **KHAN** completed a SNAP transaction at Maria's for $125.52 in exchange for $60 in cash.

f.     On or about October 19, 2015, in the presence of **DUKE**, a store clerk completed a SNAP transaction at Maria's for $123.70 in exchange for $60 in cash.

g.     On or about February 8, 2016, a store clerk completed a SNAP transaction at Royals for $105.58 in exchange for $50 in cash.

18 U.S.C. § 371

## COUNT TWO
### (Food Stamp Fraud)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 15 and 17 through 26 of Count One are incorporated here.

2.      On or about September 11, 2015, in the District of Maryland and elsewhere,

### WALAYAT KHAN

a defendant herein, did knowingly use, transfer, acquire and possess food stamp coupons,

through an EBT card, having a value in excess of $100 in a manner contrary to the Food Stamp

Act (Title 7, United States Code Section 2011, et seq.) and the regulations issued pursuant to that

program, that is, defendant **WALAYAT KHAN** redeemed $125.52 in SNAP benefits in

exchange for $60 in cash at Maria's.

7 U.S.C. § 2024(b)(1)
18 U.S.C. § 2

## COUNT THREE
**(Wire Fraud)**

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 15 and 17 through 26 of Count One are incorporated here.

2.      On or about September 11, 2015, in the District of Maryland and elsewhere,

### WALAYAT KHAN

a defendant herein, for the purpose of executing and attempting to execute the scheme to

defraud, did transmit and cause to be transmitted by means of wire, radio, and television

communication in interstate or foreign commerce, any writings, signs, pictures or sounds for the

purpose of executing such scheme and artifice, that is, the defendant knowingly used and caused

to be used a point of sale device inside Maria's to redeem electronic benefits for unauthorized

and unlawful purposes, which caused communications to be sent from a POS device in Maryland

to Texas, for a transaction for $125.52 in SNAP benefits, which were exchanged for $60 in cash

at Maria's.

18 U.S.C. § 1343
18 U.S.C. § 2

## FORFEITURE

The Grand Jury for the District of Maryland further finds that:

1.      Upon conviction of the offenses in violation of Title 18, United States Code,

Section 371 (Conspiracy to Commit Food Stamp Fraud and Wire Fraud), as set forth in Count

One of this Indictment, or Title 18, United States Code, Section 1343 (Wire Fraud), as set forth

in Count Three of this Indictment, the defendants,

### WALAYAT KHAN and
### BARBARA ANN DUKE,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c), any

property, real and personal, which constitutes or is derived from proceeds traceable to such

violations, including but not limited to a sum of money equal to the value of the proceeds of the

scheme to defraud as described in Paragraph 15 of Count One and Paragraph 2 of Count Three,

which amounts are at least $949,102 with respect to Maria's and at least $537,016 with respect to

Royals.

### Substitute Assets

2.      If, as a result of any act or omission of the defendants, any such property subject

to forfeiture:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third person;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided
          without difficulty;

it is the intent of the United States of America, pursuant to 21 U.S.C. § 853(p), to seek forfeiture

of any other property of said defendants up to the value of the forfeitable property.

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853
28 U.S.C. § 2461(c)


ROD J. ROSENSTEIN
UNITED STATES ATTORNEY

A TRUE BILL:

SIGNATURE REDACTED

Date

Foreperson

12